IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Emmanuel McCowan, | NO. C 04-00829 |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| Silvia Garcia, Warden, | |
| Respondent. | |

## I. INTRODUCTION

On December 16, 1999, Emmanuel McCowan (hereinafter "Petitioner"), a state prisoner, was sentenced to life in prison without the possibility of parole for first degree murder, with a special circumstance finding of torture. On November 13, 2001, the Court of Appeals affirmed the conviction. Consequently, Petitioner filed both a Petition for Review and a Petition for a Writ of Habeas Corpus to the California Supreme Court, both of which were subsequently denied. On February 27, 2004, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2254. After examining the record and the papers submitted by the parties in support of their respective positions, this Court finds that Petitioner's claims are without merit and therefore DENIES the petition.

## II. BACKGROUND

**A. Procedural History**

Petitioner is currently incarcerated at Calipatria State Prison, Calipatria, California, where he

is serving a life sentence without the possibility of parole. On December 16, 1999, Petitioner was convicted by jury trial in Alameda County Superior Court for the first degree murder of Yolanda Dedmon, with a special circumstance finding of torture. The court denied Petitioner's motion for a new trial. Petitioner subsequently filed an appeal with the California Court of Appeal, First Appellate District. The court affirmed the conviction on November 13, 2001. The Petitioner subsequently filed an appeal with the California Supreme Court, which was denied on February 13, 2002.

Thereafter, Petitioner filed a state habeas corpus petition in Alameda County Superior Court, raising the same three issues he had previously raised on his appeal with the California Court of Appeal, and then again, on review with the California Supreme Court. The petition was denied without a hearing on March 7, 2003.

After having exhausted his state remedies, Petitioner filed this habeas corpus petition on February 27, 2004 alleging the same violations of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Petitioner alleges the following claims for federal habeas relief: (1) failure to sever his trial from that of his brother and co-defendant, Nathaniel McCowan (hereinafter "Nathaniel"), violating the Aranda-Bruton Rule; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel.

**B. Factual History**

    **1. Discovery of the Body and Autopsy**

Yolanda Dedmon's (hereinafter "Dedmon") body was discovered on June 25, 1997, at approximately 4:00 p.m. by an 8-year old boy on his way to baseball practice at Kings Estate Middle School, a nearby middle school. Dedmon was naked, with her clothes strewn over the nearby trees and path.

An autopsy was performed by a coroner revealing that Dedmon suffered three major types of injuries to her body: a gunshot wound to her head, eighteen incised wounds, and blunt force injuries. The coroner determined that her head had been twisted around. The coroner further testified that all

2

three classes of injuries were inflicted while the victim was still alive.  (Reporter's Transcript, hereinafter "RT," 120:16-24, 155:1-8, 167:12-19, 169:3-17, 178:2-22.)  The coroner further determined that the victim most likely received these wounds while still alive.

### 2. The Night Prior to the Discovery of the Body

On June 24, 1997, at approximately 9:30 p.m., Dedmon's friend, Sabrina Stokes (hereinafter "Stokes") drove Dedmon and her daughter home.  Upon arriving home, Stokes called Dedmon at approximately 10:00 p.m.  Dedmon told Stokes she was waiting for Nathaniel to come over and pick up some letters.

Dedmon also spoke to several other people between 10:00 p.m. and 11:00 p.m.  She stated that she was waiting for "Man's brother" to come over and pick up letters.  According to trial testimony, Petitioner was nicknamed "Man" and many people referred to him and knew him by this.

Robin Wilson (hereinafter "Wilson"), the manager of Dedmon's apartment building, testified at trial that she saw Dedmon standing outside talking to someone in a faded blue, older model Chevy or Buick vehicle at approximately 11:00 p.m. the night prior to the discovery of the body.  (RT, 504:5-20, 507:13-508:23.)  Wilson could not identify who was in the car.
Stokes was driving a sky-blue Dodge Aries the night she dropped off Dedmon.  Stokes testified that Dedmon got out of the car and went directly to her apartment.  Stokes denied that Dedmon stood outside the car and talked to her before she left.  (RT, 541:17-542:5.)

### 3. The Morning Dedmon Was Discovered Missing

The morning of June 25, 1997, at approximately 8:15 a.m., Stokes arrived at Dedmon's apartment to pick up Dedmon's four-year old daughter for school.  Stokes discovered the door was unlocked, and Dedmon's daughter was home by herself.  Dedmon's wallet, keys, and pager were still in the apartment, and everything appeared in order.  Stokes phoned Robert Johnson (hereinafter "Johnson"), Dedmon's brother, in an attempt to discover her whereabouts.  After arriving, Johnson began to look around and phone family and friends.  He saw no signs of forced entry.  Johnson also spoke to Nicky, the Petitioner and Nathaniel's sister, who did not know of Dedmon's whereabouts.

3

Johnson called the police and waited for them to arrive.

While waiting for the police to arrive, Nathaniel phoned Johnson and stated he was supposed to drop by Dedmon's the night before to pick up some letters, but that he never made it. (RT, 208:6-13, 211:2-28, 219:4-14.) Nathaniel stated he left a message for Dedmon on her answering machine, however, Johnson found no message. After hearing that Johnson found no message, Nathaniel modified his statement, stating he never left a message. Nathaniel also stated that he was at a motel with a girl. (RT, 279:5-9.)

### 4. Petitioner's Relationship with Dedmon

Wilson, Dedmon's apartment manager, testified that approximately one month prior to the murder, she had taken Dedmon to visit Petitioner while he was incarcerated at Santa Rita Jail. Rhonda McCowan (hereinafter "Rhonda"), Petitioner's wife, arrived shortly after Dedmon and Wilson, and discovered that Dedmon had come to visit the Petitioner. Dedmon hid in the bathroom, while Wilson watched Rhonda visit Petitioner. Rhonda appeared to be upset.

There was testimony from both Johnson and his fiancee, Yolanda Collins (hereinafter "Collins"), that Petitioner was having an affair with Dedmon. Collins described the relationship as "on again, off again." (RT, 476:10-20, 479:10:25.) Collins stated that Petitioner called her house looking for Johnson, and requested that Collins tell Johnson to have Dedmon leave Petitioner alone. Johnson testified that between two to three months prior to Dedmon's murder, Petitioner asked Johnson to have Dedmon "stop messing with him" and that he did not want to see Dedmon anymore. (RT, 222:18-223:3.)

### 5. Torrance Randle

On October 31, 1997, Torrance Randle (hereinafter "Randle"), Petitioner's cousin, was arrested on unrelated robbery charges. He was interviewed by Sergeant Brock (hereinafter "Brock") the same day. Randle relayed a conversation he had with Petitioner the day after Dedmon's body was found. Randle was withdrawing from heroin during this interview and was being recorded without his knowledge. The crux of the recording states that Petitioner showed Randle a newspaper with an

article about Dedmon's murder, and stated that he killed her. Petitioner stated that while he was in custody at Santa Rita Jail, Dedmon tried to get Rhonda to divorce Petitioner by confronting her about their affair. Rhonda told Petitioner she wanted a divorce.

According to Randle's testimony, Petitioner stated that the night of his release from Santa Rita Jail, he went to Dedmon's house. Dedmon's daughter was asleep when he arrived. Petitioner asked Dedmon to come outside to talk to him, and they left the daughter inside the house sleeping. After entering the car, Petitioner knocked Dedmon out and took her to the hills where he "finished her." (RT, 594:12-15, 608:16-24.)

Petitioner stated to Randle that he twisted Dedmon's head all the way around while she was still alive. Petitioner stated he was trying to break her neck; Dedmon died after he cut her throat with a razor blade. Petitioner stated he killed Dedmon because she tried to "ruin him." (RT, 597:27.)

During the trial, Randle denied making any statements to Brock regarding Petitioner's involvement with the murder. A transcript of the audio tape was read aloud to the jury by Brock. The audio tape had been transcribed by Brock as the quality of the audio tape was poor, and difficult to understand. The transcript was allowed into evidence as a prior inconsistent statement, because Randle testified he never made a statement to the police during the trial. The court explained to the jury that the transcript was allowed in based upon a prior inconsistent statement exception. The court further asked the defense attorneys if they were satisfied with the court's instruction, and if they would like to add anything further. This offer was declined by both Petitioner and Nathaniel's defense attorneys.

**6. Aquila Jones**

Aquila Jones was romantically involved with Nathaniel, Petitioner's brother. She made several statements to the police during an investigation, the preliminary hearing, and the criminal trial. Her testimony at the trial indicated that she had perjured herself during the investigation and the preliminary hearing. Her alleged motivation to commit the perjury was to continue her romantic relationship with Petitioner's brother. When the relationship was over, she testified at the criminal

5

trial and indicated that she had perjured herself, and was now going to tell the truth. Her trial testimony indicated that Nathaniel said of Dedmon, "the bitch hadn't been minding her own business," and he "shot the bitch" in the head. Jones was unable to recall whether Nathaniel specifically made the statement of "she [Dedmon] was in Man's business," which was used by the prosecution to show Petitioner's motive in murdering Dedmon. After her examination was complete, the court gave jury instructions to only attribute the hearsay statements of one defendant against that defendant.

### 7. Aranda-Bruton Motion

At the outset of the trial, Petitioner filed a motion asking that his trial be severed from Nathaniel's. In the alternative, Petitioner requested that the statements Nathaniel made be redacted. The trial court refused to sever the trials, but partially granted appellant's motion for redaction.

### 8. The Defense

Petitioner defended the charges with an alibi defense. Petitioner's parents testified he was with them the night of the crime. The defense also attempted to test the credibility of both Randle and Jones. Both Randle and Jones had criminal records. Randle admitted he was withdrawing from heroin during interrogation. Jones also admitted being on drugs while speaking with Nathaniel regarding the murder. The defense attempted to imply that Jones was only testifying as to what the police and prosecution wanted to hear during the trial.

### 9. The Judgment

The jurors convicted Petitioner of first degree murder with a special circumstance finding of torture. They were unable to reach a verdict on the charges against Nathaniel, and hung eleven to one in favor of conviction. A mistrial was declared on Nathaniel's charges.

## III. STANDARDS

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA") governs federal habeas corpus review of a state judgment. See U.S.C. § 2254. Under the AEDPA, a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in

a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). A court may review a petition for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). Section 2254(d)(1) restricts the source of clearly established federal law to the Supreme Court's jurisprudence. Williams v. Taylor, 529 U.S. 362, 402 (2000).

Unless rebutted by clear and convincing evidence, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A state court's ruling based on its factual findings must be objectively unreasonable to warrant habeas relief. 28 U.S.C. § 2254(d)(2).

## IV. DISCUSSION

The Petitioner has the burden to prove by a preponderance of the evidence that his custody is in violation of the Constitution, laws or treaties of the United States under 28 U.S.C. § 2254(a). Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002).

**A**. **Failure to Sever**

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986). A federal court reviewing a state conviction under 28 U.S.C. § 2254 is not concerned with the state law governing severance or joinder in state trials. Grisby, 130 F.3d at 370. Nor is it concerned with procedural rights to severance afforded in federal trials. Id. This Court must determine whether the state appellate court's holding affirming the joinder of the two co-defendants was unreasonable in light of federal law guaranteeing Petitioner's right to a fair trial under the United States Constitution. See Strickland v. Washington, 466 U.S. 668, 674 (1984). To prevail, the Petitioner must demonstrate

7

1 that the state court's joinder or denial of his severance motion resulted in prejudice great enough to
2 render his trial fundamentally unfair. Id. This prejudice is shown if the impermissible joinder had a
3 substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon,
4 241 F.3d 765, 772 (9th Cir. 2000).

Petitioner contends that based upon the denial to sever his trial from that of his co-defendant, testimony was allowed into evidence that was prejudicial to Petitioner. Specifically, Petitioner alleges that the trial court's ruling on the Aranda-Bruton motion at the outset caused his trial to be unduly prejudicial. Petitioner bases this upon the court's statement that it would "revisit that particular issue [of whether the statement 'she was in Man's business' would be admitted] when I see or hear the final product. . . to see it in context, maybe it will be a little more helpful. . . . " Because no advance notice was given to the court prior to the prosecutor using this statement in his opening comments, Petitioner alleges the prosecutor rendered the trial fundamentally unfair. (RT, 31:18-22.)

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him" U.S. CONST. AMEND. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). The landmark case of Crawford v. Washington now allows out-of-court statements by witnesses that are testimonial hearsay to be admitted so long as the witness is unavailable and the defendant has a prior opportunity to cross-examine the witnesses. Crawford, 541 U.S. at 59. Thus, the Court's prior holding in Ohio v. Roberts that such statements may be admitted so long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness," is overruled by Crawford. See Id.

The Confrontation Clause commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id.; see Davis v.

1  Alaska, 415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right
2  of cross-examination.).  It applies not only to in-court testimony, but also to out-of-court statements
3  introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  Id.
4  at 50-51.  Confrontation Clause claims are subject to harmless error analysis.  United States v.
5  Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case).

6  For purposes of federal habeas corpus review, the standard applicable to violations of the
7  Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon
8  the jury.  See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht v. Abrahamson,
9  507 U.S. 619, 637 (1993)); Webb v. Lewis, 44 F.3d 1387, 1393 (9th Cir. 1994).  If the state court
10 disposed of a constitutional error as harmless under an appropriate standard of review, federal courts
11 must, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), first
12 determine whether the state court's harmless error analysis was objectively unreasonable.  Medina v.
13 Hornung, 386 F.3d 872, 878 (9th Cir. 2004).  If the federal court determines that the state court's
14 harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly
15 established federal law, the federal court then proceeds to the Brecht analysis, that is, whether the
16 decision was (1) "either 'contrary to,' or was an 'unreasonable application' of, 'clearly established
17 federal law' as set forth by the United States Supreme Court; or (2) was based on an 'unreasonable
18 determination' of the facts in light of the evidence presented in the State court proceeding."  Id. at 877.
19 Crawford applies retroactively to collateral attack.  Bockting v. Bayer, 399 F.3d 1010, 1021 (9th
20 Cir.), amended, 408 F.3d 1127 (9th Cir. 2005).

21 A defendant is deprived of his Sixth Amendment right of confrontation when a facially
22 incriminating confession of a nontestifying codefendant is introduced at a joint trial, even if the jury is
23 instructed to consider the confession only against the codefendant.  See Bruton v. United States, 391
24 U.S. 123, 126, 135-36 (1968).  But it appears relatively clear that a Bruton claim, like all other
25 Confrontation Clause claims, is subject to harmless error analysis.  See United States v. Angwin, 271
26 F.3d 786, 795 (9th Cir. 2001).

The trial court's reasoning that the statement "she got in Man's business" was "a statement of [Nathaniel's] own motive, which in and of itself does not implicate [Petitioner] in the actual act" is also adopted by this Court. Even if error occurred here, it would only constitute a harmless error. The appellate court also considered it as such.

The trial court made numerous admonitions to the jury that the statement "she got in Man's business" and other related statements were applicable only to the defendant making the statement. A jury can reasonably be presumed to follow a court's instructions. Greer v. Miller, 483 U.S. 756, 757 (1987). Further, juries are consistently given instructions in joint trials to compartmentalize defendants' testimony, and do so regularly.

The trial court cited duplication of evidence as a reason for denying the motion to sever the trial. Petitioner argues that this reasoning was unjustified. This Court disagrees with Petitioner. Had the trial been severed, there would have been extensive duplication of evidence, including medical testimony, testimony from Brock, testimony regarding the crime scene, and testimony from witnesses. The testimony of Jones, which Petitioner states is the most prejudicial to Petitioner, includes only a motive applicable to Nathaniel, and does not directly implicate Petitioner.

Further, the evidence against the Petitioner was compelling. There was a statement by Randle relaying information Petitioner gave after the murder, containing numerous details not yet released to the public. There was other evidence, such as Petitioner's relationship with Dedmon, and his comments to witnesses that he wanted her to stop "messing" with him. Petitioner was also under the impression that Dedmon was trying to "ruin him." The scope of evidence against Petitioner was compelling. Any error which may have occurred by not granting trial severance was harmless based upon the cumulative effect of the evidence and testimony.

Based upon the foregoing, Petitioner's writ for habeas corpus relief for failure to sever is DENIED.

**B. Prosecutorial Misconduct**

The appropriate standard of review for prosecutorial misconduct is the narrow one of due

process and not the broad exercise of supervisory power. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden, 477 U.S. at 181. Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir.) (citation omitted), cert. denied, 516 U.S. 1017 (1995). Prosecutorial misconduct must "so infect [] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168 (1986).

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); see also Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986), cert. denied, 479 U.S. 839 (1986). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990. But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1981).

Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal. See People v. Fosselman, 33 Cal. 3d 572, 580-81 (1983). But cf. Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2002) (holding that under California law an objection to evidence in the form of a motion in limine is normally sufficient to preserve the issue for appeal even in the absence of a contemporaneous objection at trial) (citing People v. Morris, 807 P.2d 949, 969 (Cal. 1991)). A petitioner who fails to observe a state's "contemporaneous objection" rules may not challenge the constitutionality of the conviction in federal court. See Engle v. Isaac, 456 U.S. 107, 129 (1982) (emphasis added).

As a preliminary matter, this Court notes that several of Petitioner's contentions of

11

1 prosecutorial misconduct were not objected to at the trial level, thus failing to preserve Petitioner's
2 right to assert an argument on appeal. This includes: (1) use of the statement "she was in Man's
3 business" during the opening and closing statements; (2) prosecutor's alleged misstatements of law in
4 what the Petitioner characterizes to be an attack on the defense attorney's conduct as evidence of guilt;
5 (3) misleading the court by referencing comments by the pathologist as to the cause of death; and (4)
6 an alleged misleading purpose in the introduction of the handguns and knives.

7 In reference to the prosecutor's opening remarks that "she [Dedmon] was shot because she was
8 in Man's business," Petitioner states that "there was no objection by the defense and neither the court
9 nor counsel revisited the issue during the trial." (Petition for Writ of Habeas Corpus "Petition," 5:16-
10 20; RT, 45:24-28.) In this instance, defense counsel filed a motion in limine pursuant to the Aranda-
11 Bruton rule, preserving the right to raise the issue of prosecutorial misconduct on appeal.

12 The two claims which are preserved on appeal are: (1) references to matters outside the
13 record relating to the alibi provided for Nathaniel by his girlfriend; and (2) Petitioner's contention that
14 the prosecutor committed misconduct during the final argument by attempting to switch the burden of
15 proof based upon the comment "Mr. Chettle [Petitioner's attorney] never did say his client was
16 innocent. He just kept saying reasonable doubt, reasonable doubt . . . . " (RT, 1166:23-26.)

17 Petitioner alleges that the prosecutor attempted to shift the burden of proof from the prosecutor
18 to the defense with comments such as "you heard no evidence at all about someone else is a snitch
19 saying someone else did it. You got absolutely no evidence in this case that somebody else did it.
20 And they're hiding behind the fact that I got the burden of proof when he said he was going to show."
21 (RT, 1165:11-15.) The jury heard both Nathaniel and Petitioner's defense counsel object to this
22 statement, which was overruled by the court as argument. This comment, when reviewed in the
23 context of the closing argument, does not unduly prejudice the Petitioner. The curative comments and
24 admonitions given to the jury, relaying who has the burden of proof, as well as the jury instructions
25 would correct an error, if any.

26 Petitioner makes a blanket allegation that the prosecutor's closing argument had numerous

27

28                                                    12

1  instances of misconduct. In direct contradiction of Petitioner's allegations that "the prosecutor's

2  closing arguments, in clear contradiction of the limiting instruction, urged the jury to consider both

3  statements against both defendants," are the prosecutor's instructions to the jury during his closing

4  argument that "remember the rule that when one defendant says something, it can only be used against

5  that defendant, not the other defendant." (Petition, 25:28 - 26:2; RT, 1070:15-17.)

6  Petitioner further alleges that there was prosecutorial misconduct when the prosecutor, during

7  closing argument, stated, " . . . if you're innocent and you got the key that sets you free and, say,

8  someone like Tunisia Mannings or your father or your mother, you mark that down and you

9  memorialize that. You publicize it. You do not keep it a secret for years and spring it on the D.A. at

10 trial . . . ." (RT, 1167:13-18.)

11 Both claims of prosecutorial misconduct were subsequently reviewed by the court during the

12 trial and overruled. This Court, when reviewing claims for prosecutorial misconduct does not

13 second-guess the judgment of the trial court. This Court reviews the entire proceedings to ensure that

14 the complained of prosecutorial actions did not infect the trial with a level of unfairness to make the

15 conviction a denial of due process. The trial court, in overruling the claims giving rise to this habeas

16 corpus action of prosecutorial misconduct, gave curative comments to diffuse any improper inferences

17 the jury may have had.

18 Further, in response to defense counsels' motion for a mistrial at the conclusion of closing

19 argument, the trial court overruled it stating that:

> . . . but I'm considering that [hiding behind the people's burden of proof] in the context in which Mr. Hing [the prosecutor] said it, and the point that he was trying to make, and leading up to, and if I – the considerable amount of time that he spent talking about the defense, what defense counsel said they expected the evidence would show in their opening statement, and trying to explain to the jury that that's no evidence, that those thoughts having been planted should be removed from the jurors' minds. And that's not the exclusive context in which that comment was made, but I – I don't think it came across meaning something that is impermissible. I think when it's considered out of context, it seems like a bigger problem than it is. I'm considering it in the context of what Mr. Hing's argument was, and I don't find it to be improper. And I think, also – let's face it – this is argument. And argument involves oftentimes addressing those things which have been said by opposing counsel. And I don't think – I did not understand Mr. Hing to be saying you can draw inferences of consciousness of guilt on the part of Emmanuel McCowan

13

because his attorney didn't argue his innocence, but rather reasonable doubt. He was arguing, basically responding to your argument, and pointing out what he thought was – I think what he thought was his position, that it was not compelling – what was not compelling about it.

(RT, 1191:8-1192:7.)

This Court adopts the trial court's reasoning that the comments, when taken out of context, pose a bigger problem than actually existed. Bringing attention to the weaknesses in Petitioner's case does not constitute prosecutorial misconduct. When looking at the closing argument as a whole, and viewing the prosecutor's arguments as a response to the defense counsel's closing argument, there is no denial of Petitioner's constitutional due process rights. Based upon the foregoing, this Court DENIES Petitioner's request for habeas corpus relief based upon prosecutorial misconduct.

**C.  Ineffective Assistance of Counsel**

Petitioner makes several claims that his trial counsel was ineffective, including: (1) failure to cross-examine on the issue of cause of death; (2) failure to request a limiting instruction on co-defendant's conflicting statements to Johnson about first leaving, then not leaving, a message for Dedmon; (3) failure to object to the prosecutor's reference to "Man's business" during the opening and closing statements; (4) failure to object to the tape recording transcript of Randle, as transcribed by Brock; (5) failure to present evidence to the jury that the gun alleged missing by the prosecution was in the custody of the police.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, guaranteeing not only assistance, but effective assistance. Strickland v. Washington, 446 U.S. 668, 686 (1984). A determination of whether a claim of ineffective assistance of counsel is valid must include an analysis of whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction. See Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980).

To prevail on a Sixth Amendment claim of ineffective assistance of counsel, Petitioner must

14

establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 446 U.S. at 687-88.[1] Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. See Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000).

### 1. Cause of Death Cross-Examination

Petitioner contends that defense counsel's failure to cross-examine on the cause of death constituted ineffective representation. Defense counsel's strategy to not examine on the cause of death in such a gruesome murder case can easily be construed as an attempt to avoid drawing further attention to the injuries inflicted upon Dedmon. Lessening time spent on whether the cause of death was caused by the numerous incisions, blunt force injuries, or the gun shot wound did not fall below an objectively reasonable attorney's standard of representation. In this situation, failure to cross-examine on the cause of death does not constitute ineffective assistance of counsel.

### 2. Limiting Instruction on Johnson's Testimony

Petitioner fails to state a reason defense counsel should have requested a limiting instruction for Nathaniel's conflicting statements to Johnson regarding first leaving, then not leaving, a message for Dedmon. This Court will assume Petitioner contends a limiting instruction should have been given for consideration of Nathaniel's statement to Johnson only for Nathaniel's case, and not to consider the statement as it relates to Petitioner's case. The trial court did give limiting instructions during several portions of the trial to that extent. An objectively reasonable attorney would not require that a limiting

---

[1] It should be noted that as soon as one component of the ineffective assistance of counsel test fails, the entire test fails.

15

instruction be given contemporaneously with the evidence, nor does the law require this. People v. Stewart, 33 Cal. 4th 425, 493-94 (2004). The failure to request a limiting instruction for Nathaniel's statement to Johnson does not constitute an ineffective assistance of counsel claim.

### 3. Prosecutor's Reference to "She Was in Man's Business"

Petitioner contends that the prosecutor's reference to "she was in Man's business" in his opening and closing statements was prejudicial. The trial court, of its own accord, did provide limiting instructions to the jury. This Court is unpersuaded that defense counsel's failure to object contemporaneously to the statements constitutes ineffective assistance of counsel. The evidence admitted against Petitioner is sufficient to return a guilty verdict. Defense counsel's failure to object to the prosecutor's reference to "she was in Man's business" during the opening and closing statements does not constitute ineffective assistance of counsel.

### 4. Transcript of Randle's Interview

Petitioner contends that defense counsel's failure to object to Randle's interview with Brock, as transcribed by Brock, constitutes ineffective assistance of counsel. The interview transcript was allowed into evidence as a prior inconsistent statement after Randle's trial testimony indicated that he was denying ever meeting or interviewing with Brock, and further stating that he did not realize he was being taped when interviewing with Brock. The interview transcript was compelling evidence for the prosecution and incredibly damaging to the defense. However, the only way this could be prejudicial to Petitioner is if Brock transcribed the interview incorrectly. Petitioner makes no such allegation. Defense counsel's failure to object to Randle's interview transcript being read at trial does not constitute ineffective assistance of counsel.

### 5. Failure to Present Evidence on the "Missing Gun"

Petitioner contends that defense counsel's failure to present evidence that the gun alleged missing by the prosecution was actually in police custody fell below the standard of care for a reasonable attorney. Even assuming defense counsel's failure to present this evidence did fall below the standard of care, Petitioner still maintains the burden of proof and is required to show a different

16

outcome was reasonably likely. Given the quantity of incriminating evidence against Petitioner, including motive, Randle's testimony, and a weak alibi, it is highly unlikely that a different outcome was probable, let alone reasonably likely. Defense counsel's failure to present this evidence does not constitute ineffective assistance of counsel.

## V.  CONCLUSION

Based upon the foregoing, this Court DENIES Petitioner's Petition for a Writ of Habeas Corpus.

Dated: August 12, 2005

04cv829denhab

/s/ James Ware
JAMES WARE
United States District Judge

17

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN MAILED TO:**

Charles Gretsch cgrets@hotmail.com
Morris Beatus morris.beatus@doj.ca.gov
Peggy S. Ruffra peggy.ruffra@doj.ca.gov

**Dated: August 12, 2005**                              **Richard W. Wieking, Clerk**

                                                        **By: /jwchambers/**
                                                            **Ronald L. Davis**
                                                            **Courtroom Deputy**

United States District Court
For the Northern District of California